UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X

WELLINGTON SHARPE and GINA MARIE
FAUSTIN,

                    Plaintiffs,

  -against-

ANTHONY COMO, JAMES J. SAMPEL, NERO
GRAHAM JR., TERRENCE C. O'CONNOR, and
NANCY MOTTOLA-SCHACHER,

                    Defendants.
----------------------------------------------------------X

**PRELIMINARY INJUNCTION**

**MEMORANDUM & ORDER**
**07-CV-1521 (NGG) (RER)**

GARAUFIS, United States District Judge:

Before the court is Plaintiffs' motion for a preliminary injunction requiring Defendants, who are Commissioners of the New York City Board of Elections, to place Plaintiffs' names on the ballot for an election to be held on April 24, 2007. For the reasons set forth below, Plaintiffs' motion is GRANTED with respect to Plaintiff Wellington Sharpe and DENIED with respect to Plaintiff Gina Marie Faustin.

**I.    Background**

The following facts are undisputed unless otherwise indicated.

In November 2006, Yvette Clarke, who until then had been a member of the New York City Council ("City Council") representing the 40th Council District, was elected to the United States Congress and announced that she would resign from the City Council at the end of the year. Jonathan P. Hicks, *Open Council Seat in Brooklyn Becomes a Candidate Magnet*, N.Y. Times, December 25, 2006, at B1. On January 3, 2007, after Clarke officially resigned, Mayor

1

Bloomberg, acting pursuant to New York City Charter § 25(b), announced that a special election would be held on February 20, 2007 to fill the resulting vacancy (the "First Special Election"). Ray Rivera, *Election for 2 Council Seats Will Be on Feb. 20*, N.Y. Times, January 4, 2007, at B5.

On January 29, 2007, Clarke endorsed Dr. Mathieu Eugene to fill her vacancy. Sewell Chan, *Metro Briefing*, N.Y. Times, January 29, 2007, at B5. On February 20, 2007, Dr. Eugene won the First Special Election with 2,076 votes, thirty-four percent of the total votes cast. Statement and Return Report for Certification of New York City Board of Elections (available at http://vote.nyc.ny.us/pdf/results/2007/special/Kings40CouncilRecap.pdf) Sharpe finished third with 728 votes, twelve percent of the total. Id. Faustin did not run. Id.

Eugene's swearing-in, scheduled for February 22, 2007, was postponed because of concerns regarding his residence. *Metro Briefing*, N.Y. Times, February 23, 2007, at B6; Ray Rivera, *Late Move-In Imperils Victory of Candidate in Council Race*, N.Y. Times, February 24, 2007, at B1. The concern was that, on the date of the special election, Eugene was not a resident of the 40th Council District, the district that elected him. Although he may have later become a resident of that district (a fact this court need not find) the City Council, which is charged with determining whether its members are qualified, New York City Charter § 45, was uncertain as to whether the date of election or the date of the swearing was the date that mattered for the purpose of determining Eugene's residence. (April 18, 2007 Tr. at 80.)

On February 22, 2007, the City Council requested, and on February 28, 2007, it received, a letter from the Office of the Attorney General expressing that courts have held that a candidate must, on election day, reside in the district he seeks to represent. (Court Ex. 6.) On March 2, 2007, the Speaker of the City Council asked Eugene to sign a sworn statement certifying that he

2

was a resident of the 40th Council District on February 20, 2007.  (Court Ex. 8.)  He never did so.

Instead, on March 5, 2007, Eugene invited his supporters to attend a campaign rally scheduled for Thursday, March 8, 2007.  (Court Ex. 10.)  On or around March 5, 2007, and possibly earlier, Councilmember Lewis Fidler advised Eugene that he ought to consider requesting a new special election.  (April 19, 2007 Tr. at 33-34.)

At the March 8, 2007 rally, held on the steps of City Hall, Eugene announced that he would decline his seat on the City Council, and requested a new special election.  Jonathan P. Hicks, *Winner in City Council Race Requests Another Election*, N.Y. Times, March 9, 2007, at B3.  That same day, Eugene officially declined his seat.  (Court Ex. 9.)  Also that same day, the Speaker of the City Counsel issued a press release stating, "I support Dr. Mathieu Eugene's decision to call for a Special Election in the 40th District."  (Court Ex. 12-4.)  Before the Speaker issued this release, her Deputy Chief of Staff spoke with representatives of the Euguene campaign "possibly more than ten" times regarding the campaign's response to the residency issue.  (April 19, 2007 Tr. at 43.)  The Deputy Chief of Staff realized on March 5, 2007 that one of Eugene's options was to decline his Council seat and request a new special election. (Id.)

On Friday, March 9, 2007, only one day after Eugene requested a new special election, Mayor Bloomberg announced that a new special election would be held on April 24, 2007 (the "Second Special Election").[1]  Jonathan P. Hicks, *New Election for Brooklyn Council Seat Is Set for April 24*, N.Y. Times, March 10, 2007, at B3.  Under New York law, this meant that potential

---

[1] The Mayor could have waited as long as three days following Eugene's official declination – until March 12, 2007 – to proclaim the date for the Second Special Election.  New York City Charter § 25(b)(1).

3

candidates had from March 9, 2007 until March 21, 2007 to circulate and file enough petitions to be named on the ballot for the Second Special Election. N.Y. Elec. L. § 6-158(9); see also New York City Board of Elections, Calendar for Independent Nominating Petitions for April 24, 2007 Special Election (available at http://vote.nyc.ny.us/pdf/documents/boe/2007SpecialElection40 CounDistCalenderforIndNomPets.pdf). On March 9, 2007, the very day Mayor Bloomberg announced the Second Special Election, Eugene began circulating petitions and collecting signatures. (Court Ex. 13.)

On Saturday, March 10, 2007, Plaintiffs first learned of the Second Special Election. (April 18, 2007 Tr. at 5, 23, 25.) Sharpe attempted to contact his attorney that day in order to begin a campaign, but was not able to reach him until Monday, March 12, 2007. (Id. at 26.) On that day, Sharpe and his attorney printed designating petitions for the Second Special Election and began to reassemble Sharpe's campaign team. (Id. at 27.) Sharpe began circulating petitions on Tuesday, March 13, 2007. (Id. at 28.)

Faustin, who had never run for office, began on March 10, 2007 to look for a printer to prepare her petitions, in addition to taking various other steps necessary to mounting a campaign. (Id. at 5.) The printers she spoke with told her they would need seven to ten days to prepare petitions. (Id. at 6.) Instead of using an outside printer, Faustin designed her own petitions on March 14, 2007, had them reviewed the following day, and had them printed the day after that, on Friday, March 16, 2007. (Id. at 7.)

On Friday, March 16, 2007, "[a] harsh winter storm marked by a mixture of snow, sleet and freezing rain descended on the Northeast," including the 40th Council District. Anahad O'Connor, *Delays and Dangers as Messy Storm Hits Region*, N.Y. Times, March 17, 2007, at

4

B1. The storm "forced school cancellations, prompted government agencies to send workers home early and led some highway agencies to warn motorists not to drive above 35 miles per hour." Id.

The storm also affected the Sharpe and Faustin campaigns. Sharpe, who had begun circulating petitions before the storm, saw his petition efforts "come[] to a standstill" during the storm "because no one, even the guys who were paid [to collect signatures] could [] go out in the street to get signatures." (April 18, 2007 Tr. at 29.) Faustin printed her petitions on March 16, 2007 but was not able to begin circulating them until late the next day. (Id. at 8.) In effect, both Sharpe and Faustin found it difficult or impossible to collect signatures on either of the two weekends that fell within the petitioning period.

The parties agree that pursuant to N.Y. Elec. L. § 6-142(2), each candidate was required to submit at least 1,002 validly signed petitions by March 21, 2007 in order to be named on the ballot for the Second Special Election.[2] (Sharpe Decl. ¶ 19; Faustin Decl. ¶ 19; LaRocca Decl. ¶ 9.) Sharpe and Faustin collected approximately 1,727 and 1,801 signed petitions, respectively, by March 21, 2007. (Sharpe Decl. ¶ 18; Faustin Decl. ¶ 20.) Following challenges, the Board of Elections determined on April 11, 2007 that only 812[3] of Sharpe's petitions and 391 of Faustin's petitions were validly signed. (Sharpe Decl. ¶ 19; Faustin Decl. ¶ 21.)

---

[2] Section 6-142(2) provides that "[a]n independent nominating petition for the nomination of candidates for an office to be filled by the voters of any other political unit must be signed by voters numbering five per centum of the total number of votes cast for governor at the last gubernatorial election in such unit[.]"

[3] Defense counsel has informed the court that due to a correction, this number has increased to 832.

5

On April 12, 2007, Plaintiffs commenced this litigation and District Judge Brian M. Cogan issued an order directing Defendants to show cause why the court should not direct Defendants to place Plaintiffs' names on the ballot for the Second Special Election. (Docket No. 3.) On April 18, I granted Eugene's motion to intervene in open court.

On April 18 and 19, 2007, this court heard oral argument from all parties and conducted a hearing to resolve certain factual issues. During that hearing, the court heard testimony from Sharpe, Faustin, Eugene, Elizabeth Fine (General Counsel to the City Council), Councilmember Kendall Stewart, Councilmember Lewis Fidler, Scott Levenson (the Eugene campaign's public relations consultant), Jean Joseph (the Eugene campaign's treasurer), and Ramon Martinez (Deputy Chief of Staff to the Speaker of the City Council). The court is grateful to the parties and their counsel for producing these witnesses, as well as written exhibits relied upon by the court, in an expedient manner.

## II. Analysis

This court is reluctant to become involved in local elections. As the Second Circuit has observed in a case seeking to invalidate a state court election decision:

> Were we to embrace plaintiffs' theory, this court would henceforth be thrust into the details of virtually every election, tinkering with the state's election machinery, reviewing petitions, registration cards, vote tallies, and certificates of election for all manner of error and insufficiency under state and federal law. Absent a clear and unambiguous mandate from Congress, we are not inclined to undertake such a wholesale expansion of our jurisdiction into an area which, with certain narrow and well defined exceptions, has been in the exclusive cognizance of the state courts.

Powell v. Power, 436 F.2d 84, 86 (2d Cir. 1970) (footnote omitted); see also Shannon v. Jacobowitz, 394 F.3d 90, 94-95 (2d Cir. 2005) (observing that Powell is still the law in this

Circuit). Because of the unusual circumstances surrounding the Second Special Election, and because those circumstance implicate federal constitutional rights, the court finds it necessary to act in this case.

"[T]he party seeking a preliminary injunction must establish that (1) absent injunctive relief, it will suffer an irreparable injury and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and the balance of hardships tips in favor of the movant." Hickerson v. City of New York, 146 F.3d 99, 103 (2d Cir. 1998). The likelihood-of-success standard (rather than the sufficiently-serious-question standard) applies whenever the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme, which is in effect the situation in this case. Bery v. City of New York, 97 F.3d 689, 694 (2d Cir. 1996).

### A. Irreparable Injury

I conclude that both Plaintiffs will suffer irreparable injury if they are denied injunctive relief. The Second Special Election at issue will take place very soon, and absent injunctive relief, neither Sharpe nor Faustin will be named on the ballot for that election. In addition, the voters who would support Sharpe or Faustin will suffer irreparable injury absent injunctive relief. I therefore must consider Plaintiffs' likelihood of success on the merits of their claims.

### B. Likelihood of Success

I deem this to be a claim alleging the deprivation of a constitutional right. "To state a claim for relief in an action brought under § 1983, [Plaintiffs] must establish that they were deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526

7

U.S. 40, 49-50 (1999). The Supreme Court has construed the word "person" in Section 1983 to include municipal corporations and similar governmental entities such as the Board of Elections. See Howlett v. Rose, 496 U.S. 356, 376 (1990); Monell v. New York City Dept. of Social Services, 436 U.S. 658, 663 (1978). Because Defendants are "officials . . . who speak with final policymaking authority for" the Board of Elections, McMillian v. Monroe County, 520 U.S. 781, 784-85 (1997), I find that Plaintiffs have sufficiently alleged state action based on Defendants' decision that Plaintiffs have not collected sufficient signatures to be named on the ballot for the Second Special Election.

This means that Sharpe's and Faustin's likelihood of success must be determined according to a three-step test set forth by the Supreme Court, which Judge Korman described as follows in Rockefeller v. Powers, 917 F. Supp. 155 (E.D.N.Y. 1996):

> Analysis of the validity of ballot access signature requirements to determine whether they unduly burden the right to vote proceeds in three steps:
>
>> [A reviewing court] must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it must also consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all of these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.
>
> Anderson v. Celebrezze, 460 U.S. 780 (1983) (internal citation omitted). The Supreme Court has recently explained how these factors should be balanced:
>
>> Under this standard the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment

8

> rights. Thus, as we have recognized when those rights are subjected to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance." But when a state election law provision imposes only "reasonable, non-discriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's important regulatory interests are generally sufficient to justify" the restrictions.

Burdick v. Takushi, 504 U.S. 428, 434 (1992) (internal citations omitted). Rockefeller, 917 F. Supp. at 159-160.

I note as a preliminary matter that nothing in this opinion is intended to indicate that I find any provision of the New York City Charter or New York State Election Law facially unconstitutional. Rather, I consider only the application of the City Charter and Election Law to Plaintiffs in the specific and, to the best of this court's knowledge, unique circumstances surrounding the April 24, 2007 special election.

### 1. Injury to Plaintiffs' Rights

First, the court must consider the magnitude of the asserted injury to Plaintiffs' rights. That injury is of great magnitude. Plaintiffs argue, and this court agrees, that if Plaintiffs are not named on the ballot, "they would lose their ability to voice the concerns that they hold dear. In addition, the citizens who support these candidates would also in turn lose their ability to vote for a candidate who speaks for their interests." (Pls.' Br. at 12.)

### 2. The State's Interest

Second, the court must identify the State's interest. The State has an interest in permitting only those candidates who are viable to be named on ballots. The Second Circuit has held that "[r]equiring a candidate to have a 'modicum of support' within their district before their name appears on the ballot is well-established as a legitimate and important state interest, which

9

helps to avoid confusion, deception, and even frustration of the democratic process." Lerman v. Board of Elections in City of New York, 232 F.3d 135, 151 (2d Cir. 2000) (citations and some quotation marks omitted).

The court must nevertheless consider the extent to which this interest makes it necessary to burden Plaintiffs' rights. Celebrezze, 460 U.S. at 789. In the case of Sharpe, the need to burden his rights is limited at best. Sharpe qualified for the ballot in the First Special Election, for the very same vacancy and under the very same petition-filing requirements applicable to the Second Special Election. In addition, Sharpe finished third out of a field of ten in the First Special Election, and it appears that the candidate who finished second has not attempted to run in the Second Special Election, suggesting that Sharpe will be an especially viable candidate in the Second Special Election. For these reasons, Sharpe has already demonstrated that he is not the sort of frivolous candidate who lacks a "modicum of support" and should not appear on the ballot. Because Faustin is a first-time candidate, however, the extent to which it is necessary to burden her rights is much greater.

### 3. Weighing Plaintiffs' Injury Against the State's Interest

Third, the court must weigh the burden on Plaintiffs' rights against the relevant State interest. This court is most reluctant to interfere with the State's right to test whether a potential candidate has a modicum of support, and finds no reason to interfere with the manner in which the State has done so with respect to Faustin, a first-time candidate. I find, however, that the burden imposed on Sharpe, who was a viable candidate in an identical election held in the very recent past, is undue.

Sharpe collected enough valid signatures to appear on the ballot for the First Special Election, which was held to fill the very vacancy now at issue. He finished third in that election out of a field of ten. He is therefore not the sort of frivolous candidate that the State is interested in keeping off the ballot.

Unfortunately for Sharpe, the First Special Election was effectively cancelled, after it was held, at the request of Eugene. On March 9, 2007, when Mayor Bloomberg granted Eugene's wish and ordered the unprecedented Second Special Election, he immediately triggered the thirteen-day period for circulating nominating petitions under Section 6-158(9) of New York's Election Law. That period ended on March 21, 2007. Eugene began circulating nominating petitions immediately on March 9, 2007 and throughout the petition period, apparently utilizing seventy-five petition gatherers. Sharpe and Faustin, by contrast, did not even learn of the Second Special Election until March 10, 2007, and could not begin gathering signatures until March 13 and 17, 2007, respectively.

Eugene claims that on March 5, 2007, when he invited his supporters to attend his March 8, 2007 rally, he had no inkling that he would request a Second Special Election. Eugene, who also claims to be a physician, lacks credibility on this point. He first testified under oath, at a hearing before this court held yesterday and today, that he decided to decline his Council seat only after arriving at City Hall on March 8, 2007 and learning that he would not be sworn in. (April 18, 2007 Tr. at 46.) He then admitted, however, that he did not even enter City Hall on March 8, 2007 and that on that date neither he nor any of his associates discussed with representatives of the City Council whether he would be permitted to be sworn. (Id. at 50, 52.)

Moreover, it now appears, based on the testimony of the General Counsel to the City Council, that Eugene had no basis at all to believe that he would be sworn on March 8, 2007 because he had no reason to believe that he would be found qualified on that date. (Id. at 85-87.) Indeed, he had not even signed the certifications regarding his residency that the City Council made clear were prerequisites to finding him qualified. (Id.) I therefore find that Eugene knew no later than March 5, 2007 that he would request a Second Special Election, and that he was therefore the only potential candidate able to begin circulating petitions on March 9, 2007, immediately upon the Mayor's announcement that there would be a Second Special Election. Because Eugene's manipulation gave him a head start against his would-be rivals, and because one of those rivals, Plaintiff Wellington Sharpe, has already qualified for the ballot for the First Special Election, under the very rules that apply to the Second Special Election, I find that Sharpe has been the victim of an undue burden.

## III. Conclusion

This decision is limited to the specific facts before me and should be read narrowly. What makes this case unique, and what compels me to order that Sharpe's name be added to the ballot, is that the Second Special Election became necessary because of the conduct of someone who intended to run in it, namely, Mathieu Eugene.

Plaintiffs' motion for a preliminary injunction is granted with respect to Plaintiff Wellington Sharpe and denied with respect to Plaintiff Marie Gina Faustin. I hereby order the New York City Board of Elections to place Sharpe's name on the ballot for the Second Special

Election, *i.e.*, the special election for the City Council, 40th Council District, scheduled for April 24, 2007.[4]

SO ORDERED.

Dated: April 19, 2007  
      Brooklyn, N.Y.

      /s/ Nicholas G. Garaufis  
      NICHOLAS G. GARAUFIS  
      United States District Judge

---

[4] The court has not researched whether the seven other candidates who appeared on the ballot for the First Special Election but not the ballot for the Second Special election were denied access to the latter. The court has considered cancelling the Second Special Election and ordering a new one, offering all candidates adequate notice. Because that form of relief has not been requested by Plaintiffs in this case (and would constitute a far more severe remedy) and because those seven other candidates are not parties to this case, the court will not pursue that option.